1
2
3
4
5
6
7
8             UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10

11   TINA MARIE JIMENEZ,                     No. 2:22-cv-02004-DJC-CSK

12              Plaintiff,

13        v.                                 **<u>ORDER</u>**

14   CITY OF SACRAMENTO, as a
     municipal corporation; RYAN
15   FRANZEN, in his individual capacity;
     COREY C. STACKHOUSE, in his
16   individual capacity; MICHAEL CASE,
     in his individual capacity; and MELVIN
17   P. CUCKOVICH, in his individual
     capacity,
18
19              Defendants.

20        On November 6, 2020, four Sacramento Police Department officers, trying to

21   locate Isais Martell, arrived at the home of Plaintiff Tina Jimenez, a known contact of

22   Martell.  An altercation ensued after Jimenez attempted to prevent the officers from

23   accessing her car, which was parked in the driveway of her home, resulting in one of

24   the officers forcibly handcuffing and restraining Jimenez.  Jimenez brings this suit

25   under 42 U.S.C. § 1983 and *Monell v. Department of Social Services of City of New

26   York*, 436 U.S. 658 (1978), alleging four causes of action: (1) an officer used

27   unreasonable force while restraining Jimenez, (2) the other officers failed to intercede

28   while Jimenez was being unjustly and forcibly detained, (3) the officers conducted

                                             1

1  unreasonable searches of her car by placing a GPS tracker in it during a traffic stop

2  and later retrieving that tracker while she was detained, and (4) the City of Sacramento

3  has an unlawful practice of conducting illegal searches and using unreasonable force.

4  (*See* ECF No. 1 at ¶¶ 38–61.)  Defendants move for summary judgment of the claims.

5  (ECF No. 16.)  For the reasons discussed below, the Court GRANTS in part

6  Defendants' Motion as to Plaintiff's fourth cause of action (*Monell* claim for

7  unconstitutional placement of GPS tracking devices) and DENIES Defendants' Motion

8  as to Plaintiff's first, second, and third causes of action, and DENIES in part as to

9  Plaintiff's fourth cause of action (*Monell* claim for unreasonable force).

10                                                **FACTS**

11          Sacramento Police Department officers Ryan Franzen, Corey C. Stackhouse,

12  Melvin P. Cuckovich, and Michael Case (collectively "Officers") visited Plaintiff Tina

13  Jimenez's house on November 6, 2020.  (ECF No. 1, hereinafter "Compl." ¶ 10; *see*

14  ECF 20-2, Undisputed Material Facts, hereinafter "UMF," No. 9.)  When the Officers

15  arrived at the house's front door, they were met by Salena, a family member of

16  Jimenez.  (Compl. ¶ 12; UMF No. 9.)  The Officers informed Salena that they were

17  there to perform a "parole search" of Isais Martell and asked whether he was present

18  at the property.  (Compl. ¶ 13; *see* UMF No. 10.)  Isais Martell is a known participant in

19  California's Post Release Community Supervision (PRCS) program.  (UMF No. 1.)

20  Salena informed the Officers that Martell was not present.  (Compl. ¶ 14.)  Salena then

21  fetched Jimenez, who informed the Officers that Martell did not live at the property

22  and that his "probation" form listed an address that was different from hers.  (*Id.*

23  ¶¶ 18–19.)  The Officers then made a statement implying that Martell's car was

24  present, to which Jimenez replied that the car in question – a 2007 Infiniti M45 – was

25  actually hers.  (*Id.* ¶¶ 20–21; *see* UMF Nos. 7, 12.)  Jimenez asserts that the car was

26  purchased by and registered to her, and she has only on rare occasions allowed family

27  members or associates to drive it.  (Compl. ¶ 21.)

28

1    Jimenez had allowed Martell to use her car on at least two prior occasions.

2  Four days prior, on November 2, 2020, Martell and Jimenez were pulled over for a

3  traffic stop, during which the Officers searched the car but did not uncover any

4  evidence of a crime. (*Id.* ¶ 23; UMF No. 1.) Martell was driving the car at the time of

5  the traffic stop. (Compl. ¶ 21; UMF Nos. 1–2.) Additionally, on an unspecified date

6  several months earlier, the Officers saw Martell driving the vehicle without Jimenez

7  present. (UMF No. 5.)

8    While at her house, the Officers requested access to Jimenez's vehicle, which

9  she refused. (Compl. ¶ 24; UMF No. 11.) The Officers then asked her for her car keys,

10  to which Jimenez responded that she did not have them, and that they were with her

11  mother who "lives past Davis, [California]." (Body-Worn Camera ("BWC") X81368533

12  of Officer Franzen at 02m55s-3m0s; *see* UMF Nos. 11, 14.) Ignoring her protests,

13  Officer Franzen approached the vehicle, which was apparently unlocked, and opened

14  the driver's side door. (Compl. ¶ 24; UMF No. 15.) Meanwhile, Jimenez approached

15  the vehicle and physically obstructed the officer from further opening the door. (*See*

16  Compl. ¶ 25.) Officer Franzen then forcibly restrained Jimenez using wrist ties. (*See*

17  *id.* ¶ 26; *see also* UMF No. 19.) Jimenez asserts she felt an immediate sensation of

18  severe pain and exclaimed to the Officers that she believed her arm was broken and

19  to release her. (Compl. ¶ 27.) Instead, the Officers placed her in the back of a police

20  vehicle and called paramedics. (*Id.* ¶ 28; UMF Nos. 27.) While Jimenez was inside the

21  police vehicle, Officer Franzen returned to Jimenez's vehicle, which had its trunk

22  opened by one of the other Officers. (Compl. ¶ 29; UMF Nos. 18–21.) Officer

23  Stackhouse whispered something to Officer Franzen along the lines of "you grab it,"

24  and Officer Franzen then retrieved a GPS-monitoring device from the trunk of the

25  vehicle and put it in his pocket. (Compl. ¶¶ 29–31; *see* UMF Nos. 24–26; *see also* BWC

26  X81368533 of Officer Franzen at 05m55s-06m02s.) Officer Franzen then closed the

27  trunk; no additional search of the vehicle was conducted. (Compl. ¶ 32.)

28

3

1    Officer Franzen cited Jimenez for violating California Penal Code section 148

2  (resisting, delaying, or obstructing a peace officer).  (*Id.* ¶ 33; UMF No. 28.)  Before

3  issuing the citation, Officer Franzen noted to his colleagues that California Penal Code

4  section 148 is "good for everything else.  It's good for having to twist her up,

5  especially since she's complaining of pain now."  (Compl. ¶ 33; BWC X81368533 of

6  Officer Franzen at 6m45s–7m12s, *see* 13m43s–14m05s.)  The misdemeanor criminal

7  complaint against Jimenez was later dismissed.  (Compl. ¶ 37.)

8                                    **LEGAL STANDARD**

9    The Federal Rules of Civil Procedure provide that summary judgment is

10  appropriate when "there is no genuine dispute as to any material fact and the movant

11  is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v.*

12  *Catrett*, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

13  dispose of factually unsupported claims or defenses.  *See Celotex*, 477 U.S. at 325.

14  Therefore, the "threshold inquiry" is whether "there are any genuine factual issues that

15  properly can be resolved only by a finder of fact because they may reasonably be

16  resolved in favor of either party[,]" or, conversely, "whether it is so one-sided that one

17  party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

18  250–52 (1986).  But "the mere existence of some alleged factual dispute between the

19  parties will not defeat an otherwise properly supported motion for summary

20  judgment[.]"  *Id.* at 247–48.  "Only disputes over facts that might affect the outcome of

21  the suit under the governing law will properly preclude the entry of summary

22  judgment."  *Id.* at 248.

23    On summary judgment, the moving party always bears the initial responsibility

24  of informing the court of the basis for the motion and identifying the portions of the

25  record "which it believes demonstrate the absence of a genuine issue of material fact."

26  *Celotex*, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden

27  then shifts to the opposing party, which "must establish that there is a genuine issue of

28  material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585

1  (1986).  To meet its burden, either party must "(A) cit[e] to particular parts of materials

2  in the record, . . . or (B) show[ ] that the materials cited do not establish the absence or

3  presence of a genuine dispute, or that an adverse party cannot produce admissible

4  evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

5      For the non-moving party to succeed and avoid summary judgment, the non-

6  moving party "must do more than simply show that there is some metaphysical doubt

7  as to the material facts."  *Matsushita*, 475 U.S. at 586.  Rather, the non-moving party

8  must produce enough evidence such that "the 'specific facts' set forth by the

9  nonmoving party, coupled with undisputed background or contextual facts, are such

10  that a rational or reasonable jury might return a verdict in its favor based on that

11  evidence."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th

12  Cir. 1987).  In other words, for the moving party to succeed, the Court must conclude

13  that no rational trier of fact could find for the non-moving party.  *Matsushita*, 475 U.S.

14  at 587.  However, so as not to "denigrate the role of the jury[,] . . . [c]redibility

15  determinations, the weighing of the evidence, and the drawing of legitimate

16  inferences from the facts are jury functions," and so the Court draws all reasonable

17  inferences and views all evidence in the light most favorable to the non-moving party.

18  *Anderson*, 477 U.S. at 255; *see Matsushita*, 475 U.S. at 587–88.

19                                     **DISCUSSION**

20      Plaintiff Jimenez challenges Officer Franzen's use of force against her, the other

21  Officers' failure to intercede to stop the unlawful use of force, and the subsequent

22  search of her vehicle as being in violation of the Fourth Amendment of the U.S.

23  Constitution and 42 U.S.C. § 1983.  Additionally, she alleges that the Sacramento

24  Police Department employed a pattern of unconstitutional conduct resulting in

25  unlawful searches, seizures, and citing of individuals for resisting arrest, in violation of

26  *Monell*.  Defendants seek summary judgment on each of these claims.

27  ////

28  ////

5

1    **A. The November 2, 2020, Search of Jimenez's Vehicle, Which Resulted in**
2    **the Placement of a GPS Tracking Device, Was Lawful.**

3    Typically, the Fourth Amendment protects individuals "against unreasonable

4    searches and seizures . . . [without] probable cause."  U.S. Const. amend. IV.  However,

5    formerly incarcerated individuals who participate in California's PRCS program are

6    subject to search or seizure without warrant.  *People v. Douglas* ("*Douglas*"), 240 Cal.

7    App. 4th 855, 862 (2015), *as modified on denial of reh'g* (Oct. 19, 2015); Cal. Pen.

8    Code § 3465.  An officer's knowledge that an individual is enrolled in the PRCS

9    program is a sufficient basis for a lawful search or seizure of that individual or their

10   property.  *Douglas*, 240 Cal. App. 4th at 862.  While the PRCS program is distinct from

11   parole and probation, California courts have analogized participation in the PRCS

12   program to being on parole.  *See Douglas* 240 Cal. App. 4th at 860; *see also United*

13   *States v. Miller*, 694 Fed. App'x. 609, 610 (9th. Cir. 2017) ("California appellate courts

14   have likened PRCS to parole.").

15   Although not raised in her Complaint, Jimenez alleges in her subsequent

16   briefing that the search of her vehicle and the initial placement of the GPS device was

17   unconstitutional because she herself was not a participant in the PRCS program, and

18   thus, the Officers would need to establish probable cause that a crime was occurring

19   to conduct a search.  (ECF No. 20 at 6-7, hereinafter "Opp'n.")  But, during the

20   November 2, 2020, traffic stop, Martell was driving Jimenez's car.  (UMF No. 1.)

21   Martell is a known participant in the PRCS program.  (*Id.*)  Because the Officers knew

22   Martell is a participant in the PRCS program, the Officers had a lawful basis for

23   stopping and searching the vehicle.  Martell, as the driver of the vehicle, undisputably

24   had control over it, sufficiently enabling the Officers to stop it, search it, and place the

25   GPS tracking device.  *See United States v. Korte*, 918 F.3d 750, 757 (9th Cir. 2019) (it is

26   lawful for officers to place GPS tracking devices in vehicles operated by parolees).

27   Accordingly, the officers did not commit a constitutional violation by stopping and

28   placing a GPS tracker on the vehicle while Martell was operating it.

6

**B. The November 6, 2020, Search of Jimenez's Vehicle, Which Resulted in the Removal of the GPS Tracking Device, Was Unlawful.**

Individuals who are not on parole or are not participants in a parole-like program (e.g., PRCS) have the full protection of the Fourth Amendment. *See* U.S. Const. amend. IV.

The question the Court must confront is whether the period between the Officers' sighting of Martell operating Jimenez's vehicle some time prior without Jimenez, and then on November 2 with Jimenez, is sufficient to establish a reasonable belief in the Officers that Martell had control over the vehicle during the November 6 incident. Jimenez asserts, as she did on November 6, that the car was in her sole possession, that Martell was not present, and that she did not consent to a search of her vehicle. (Compl. ¶ 24; UMF No. 12.) Jimenez argues that because Martell was not in the possession of her vehicle, the Officers did not have a basis to search her vehicle without probable cause or a warrant.

It is entirely reasonable for the Officers to believe that Martell had dominion over Jimenez's vehicle while he was driving it. *See United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998) (noting that a third party has actual authority over a container if they have mutual use of and joint access or control over that container); *see also United States v. Lopez*, 474 F. Supp. 943, 947 (C.D. Cal. 1979) (drawing a privacy right distinction between passengers and "those individuals who have had control of the vehicle or the keys"). However, viewing the facts in the light most favorable to Plaintiff as the non-moving party, that belief is not reasonably supported by the information available to the Officers on the night of November 6. When the Officers arrived at Jimenez's house, it quickly became apparent that Martell was not present, and that the owner of the vehicle, Jimenez, did not consent to a search of her property. The Officers otherwise had no basis or underlying probable cause that a crime was occurring that would enable them to search the car parked in her driveway. While it is true that Martell used Jimenez's vehicle at least twice over the time span of

7

1    several months, "[t]he sporadic and limited availability [of a car] does not comport with

2    the formal 'joint control arrangements'" recognized by courts.  *United States v. Kovac*

3    ("*Kovac*"), 795 F.2d 1509, 1511 (9th Cir. 1986).

4        Jimenez had a reasonable expectation of privacy in her vehicle, which was

5    parked in front of her residence, out of the presence of Martell.  The Court finds that

6    the facts support Jimenez's expectation of privacy, and that the Officers violated her

7    Fourth Amendment rights by searching her property without her consent or a

8    reasonable suspicion that a crime was occurring.

9    **C. Whether Officer Franzen Used Unreasonable Force Against Jimenez and**

10       **Whether the Other Officers Had a Duty Intervene Cannot be Resolved on**

11       **Summary Judgment.**

12       While the Officers searched Jimenez's vehicle in violation of her Fourth

13   Amendment right to privacy, it appears Jimenez used her body to obstruct Officer

14   Franzen from further accessing the vehicle.  (*See* UMF No. 17; BWC of Officer

15   Stackhouse X81067653 at 03m17s–03m19s.)  As a result, Officer Franzen physically

16   restrained Jimenez in handcuffs, causing her to experience pain.  (*See* UMF No. 19;

17   Compl. ¶ 27.)  The remaining Officers did not intervene.  (Compl. ¶ 26.)

18       Officer Franzen argues that any use of force against Jimenez was reasonable

19   under the circumstances.  The Fourth Amendment of the United States Constitution

20   protects against unreasonable uses of force.  U.S. Cont. Amend. IV.  But whether an

21   officer's use of force is unreasonable is often a question of fact better suited for a jury,

22   rather than a court, and thus is not always appropriate for summary judgment.  *Glenn*

23   *v. Wash. Cnty.*, 673 F.3d 864, 878 (9th Cir. 2011) ("We recognize that the officers have

24   offered evidence that could support a verdict in their favor . . . But on summary

25   judgment, the district court is not permitted to act as a factfinder. The circumstances

26   of this case can be viewed in various ways, and a jury should have the opportunity to

27   assess the reasonableness of the force used after hearing all the evidence."); *Liston v.*

28   *Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997), *as amended* (Oct. 9, 1997),

1    ("We have held repeatedly that the reasonableness of force used is ordinarily a

2    question of fact for the jury.")  The Court recognizes that the scope of force used by

3    Officer Franzen against Jimenez may support a number of conclusions, making it unfit

4    for adjudication at the summary judgment stage.  A reasonable decisionmaker, after

5    viewing the video of the interaction between Officer Franzen and Jimenez, could

6    plausibly conclude either the force used was justified under the circumstances, or

7    alternatively that Officer Franzen did not use reasonable force.  Accordingly, the Court

8    cannot resolve the question of whether the Officers used unreasonable force against

9    Jimenez and leaves that question to future consideration by a jury.

10          Jimenez also alleges that during the altercation between her and Officer

11    Franzen, Officers Stackhouse and Cuckovich failed to intervene to prevent Officer

12    Franzen from committing a constitutional violation.  "[P]olice officers have a duty to

13    intercede when their fellow officers violate the constitutional rights of a suspect or

14    other citizen." *United States v. Koon,* 34 F.3d 1416, 1447 n.25 (9th Cir.1994)

15    (collecting cases establishing a duty to intercede), *rev'd in part on other grounds,* 518

16    U.S. 81 (1996).  As Defendants note, that duty applies when an officer is present when

17    such a violation by another officer occurs, and when the witnessing officer has

18    sufficient time to properly intervene.  *See Cunningham v. Gates,* 229 F.3d 1271, 1289–

19    90 (9th Cir. 2000); (ECF No. 16 at 18.)  But, as discussed in the preceding paragraph,

20    whether Officer Franzen committed a constitutional violation in his use of force against

21    Jimenez cannot be resolved at this juncture.  And while it is not disputed as to

22    whether Officers Stackhouse and Cuckovich witnessed Officer Franzen's alleged use

23    of unreasonable force, the issue of whether they had time to properly intervene is also

24    an unresolved question of fact, and therefore not suitable for summary judgment.

25    Because the threshold question of whether Officers Stackhouse and Cuckovich had a

26    duty to intercede depends on a finding that a constitutional harm has occurred which

27    has not yet been determined, Jimenez's claim that the Officers failed that duty cannot

28    be defeated by Defendants on summary judgment.  *See Pearson v. Callahan*, 555 U.S.

1  223, 236 (2009) (giving district courts discretion to look to whether a constitutional

2  harm has occurred before determining whether a defendant is entitled to qualified

3  immunity).

4  **D.  The Officers Are Not Entitled to Qualified Immunity.**

5  Defendants also argue that they are entitled to qualified immunity.  A

6  government official is entitled to qualified immunity from a claim for damages unless

7  the plaintiff raises a genuine issue of fact showing that: (1) "a violation of a

8  constitutional right," occurred and (2) that the right was "clearly established at the time

9  of [the] defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232.  When

10  determining whether a right was clearly established, "existing precedent must have

11  placed the statutory or constitutional question beyond debate."  *Kisela v. Hughes*, 584

12  U.S. 100, 104 (2018) (internal quotations omitted).  "Because the focus is on whether

13  the officer had fair notice that [their] conduct was unlawful, reasonableness is judged

14  against the backdrop of the law at the time of the conduct."  *Brosseau v. Haugen*, 543

15  U.S. 194, 198 (2004).  And while courts must not define clearly established law with a

16  high level of generality, *District of Columbia. v. Wesby*, 583 U.S. 48, 63 (2018), a

17  "general constitutional rule already identified in the decisional law may apply" to

18  similar factual scenarios, *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018)

19  (internal quotations omitted).  *See Polanco v. Diaz*, 76 F. 4th 918, 930, n.8 (9th Cir.

20  2023) ("We routinely rely on the intersection of multiple cases when holding that a

21  constitutional right has been clearly established.")  "For purposes of qualified

22  immunity's clearly established prong, there does not have to be a case directly on

23  point."  *D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 773 (9th Cir. 2025) (internal

24  quotations omitted).  In other words, there is no strict requirement that "the very

25  action in question has previously been held unlawful."  *Anderson v. Creighton*, 483

26  U.S. 635, 640 (1987).

27  In general, it is not permissible for a police officer to search a vehicle without a

28  warrant.  *See Katz v. United States*, 389 U.S. 347, 357 (1967) ("[S]earches conducted

1    outside the judicial process, without prior approval by judge or magistrate, are per se

2    unreasonable under the Fourth Amendment – subject only to a few specifically

3    established and well-delineated exceptions.").  Jimenez had a valid Fourth

4    Amendment right to the privacy of her vehicle, which was parked in front of her

5    residence, and away from Martell, who was last known to access it four days prior.

6    Existing caselaw at the time of the Officers' visit to Jimenez's house should have put

7    the Officers on notice that they must have a supportable and reasonable suspicion

8    that the vehicle was Martell's before they conducted their search to retrieve the GPS

9    tracking device.

10    These cases include *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en

11    banc), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th

12    Cir. 2012), in which the Ninth Circuit recognized the important Fourth Amendment

13    protections that apply to both people with parole status, such as Martell, and to third

14    parties, such as Jimenez.  In *Motley*, the Ninth Circuit held that "[g]enerally, a condition

15    of parole that permits warrantless searches provides officers with the limited authority

16    to enter and search a house where the parolee resides, even if others also reside

17    there.  But they have to be reasonably sure that they are at the *right* house."  *Id.* at

18    1079.  This safeguard of "[r]equiring officers to have probable cause to believe that a

19    parolee resides at a particular address prior to conducting a parole search protects

20    the interest of third parties."  *Id.* at 1080.

21    And in *United States v. Grandberry*, 730 F.3d 968 (9th Cir. 2013), the Ninth

22    Circuit held that there must be strong evidence that a parolee resides at a specific

23    address before an officer can search that location.  The *Grandberry* court recognized

24    that while parolees may be subject to warrantless searches of their residences as a

25    condition of their release, "[u]nder our precedents . . ., before conducting a

26    warrantless search of a residence pursuant to a parolee's parole condition, law

27    enforcement officers must have probable cause to believe that the parolee is a

28

11

1    resident of the house to be searched." 730 F.3d at 973 (internal quotations omitted).[1]

2    This is a "relatively stringent standard." *United States v. Franklin*, 603 F.3d 652, 656

3    (9th Cir. 2010), quoting *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006).

4        These cases identify an already-existing expectation that an officer should have

5    some level of certainty that the property they are searching indeed belongs to the

6    parolee. Because Jimenez is not a parolee, the question for the Court is whether

7    Martell, who is a parolee and who had access to the vehicle four days prior, would

8    lead the Officers to reasonably suspect that Jimenez's vehicle was in Martell's control.

9        *Kovac*, a decision issued well before the events in question, is a helpful guide

10    when weighing whether Martell's limited access amounted to control over Jimenez's

11    vehicle. 795 F.2d at 1510–1511. In *Kovac*, a woman was stopped when driving away

12    from a drug dealer's home and admitted that she saw drugs at the home, allowing the

13    officers to then get a search warrant for the home. *Id.* at 1510. The drug dealer

14    argued that the officer's stopping of the woman's car violated his Fourth Amendment

15    right. *Id.* He posited that because (1) the car was parked in front of his home during

16    prior officer surveillance, (2) he had driven the car once during that period, (3) his wife

17    had a key to the car, and (4) he and his wife had permission to use the car, he

18    therefore had an expectation of privacy in the vehicle. *Id.* The Ninth Circuit rejected

19    that argument. It contrasted ownership of the car against the drug dealer's sparing

20    use of it, noting that "[the drug dealer] did not own the car and thus did not have an

21    inherent right to control the car." *Id.* Further, the Ninth Circuit noted that the drug

22    dealer was not "present at the stop so as to be exercising actual control of the

23    vehicle." *Id.* at 1511. "The sporadic and limited availability of [the woman's car] car to

24    [the drug dealer] does not comport with the formal 'joint control' arrangements which

---

26 [1] *Grandberry* quotes from *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006) and *Motley v.*

27 *Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005). Both cases have been overruled in part on other grounds. *See United States v. King*, 687 F.3d 1189 (9th Cir. 2012). Despite this, *Grandberry* recognizes that

28 *Howard* and *Motley* still provide applicable rules regarding necessary probable cause before searching a parolee's residence. 730 F.3d at 973.

1    we have recognized as conferring a legitimate expectation of privacy on a defendant

2    in a place he does not own." *Id.*  In essence, limited access to a vehicle does not

3    equate to control over that vehicle, especially when the person in question is not

4    physically present when an officer wants to conduct a search.

5            Applying *Kovac* here, the fact that Martell used the vehicle once in the previous

6    four days, and an additional time some months earlier, does little to establish he had

7    control at the time the Officers effectuated the second search.  Martell was not

8    physically present when the Officers conducted the second search.  And, Jimenez

9    gave the Officers ample notice that the vehicle was hers, explicitly telling them so

10   when they arrived.  Jimenez also fairly points out that Martell's parole[2] address does

11   not list her home address, and that she told the Officers that her mother, and not

12   Martell, possessed the vehicle's keys.  Together, these facts establish that the vehicle

13   belonged to Jimenez and was within her control, rather than Martell's.  Considering

14   the strong constitutional protection from unwarranted seizures, the Officers' being on

15   notice that the vehicle belonged to Jimenez, and the fact that Martell had not been

16   seen in the vehicle for several days, the Court concludes that the Officers had no basis

17   for conducting the second search.  Further, given the body of caselaw requiring an

18   officer's sufficient degree of knowledge that an effect indeed belongs to a parolee

19   before searching it, the Officers should have reasonably known such a search was

20   impermissible.  *See Grandberry*, 730 F.3d at 973–76; *see also Motley*, 432 F.3d at

21   1079–80.

22           Defendants argue that the applicable Fourth Amendment standard was not

23   established until the Ninth Circuit decided *United States Dixon*, 984 F.3d 814 (9th Cir.

24   2020), which was issued a month after the incident occurred, and thus was not clearly

25   established at the time the Officers searched Jimenez's vehicle. (*See* ECF No. 16 at

26   14.)  But while it is true that *Dixon* is more squarely on all fours with this case, it did not

27   _____

28   [2] While Jimenez refers to it as a "probation" address, it is apparent to the Court that she is referring to Martell's PRCS/parole address

1   break new ground or develop any new legal theory: it merely synthesized existing

2   caselaw, including *Grandberry* and *Motley*, that already established the proposition

3   that in order to search a parolee or their effects, officers must have a sufficient "degree

4   of knowledge" that the search condition applies to the place or object to be searched.

5   *Dixon*, 984 F.3d at 821, quoting *Grandberry*, 730 F.3d at 974–75.   Indeed, the *Dixon*

6   Court described the current state of the law as follows: "We have explained that to

7   conduct a search of property pursuant to [a supervised release condition], the

8   individual subject to it must 'exhibit[] a sufficiently strong connection to [the property

9   in question] to demonstrate 'control' over it." *Dixon*, 984 F.3d at 818, quoting *Korte*,

10  918 F.3d at 754 and *Grandberry*, 730 F.3d at 980.  The fundamental thrust of these

11  cases is that a third party who is not a parolee is fully protected by the Fourth

12  Amendment, and if an officer is going to conduct a search, they must satisfy the

13  relatively stringent probable cause requirements that what they are searching belongs

14  to the parolee and not an innocent third party.  *See Motley*, 432 F.3d at 1080.  It is

15  unsurprising that *Dixon* relied on these previous cases given that they all address the

16  fundamental right of a person against unreasonable searches and seizures under the

17  Fourth Amendment, and the Court views this principle as being applicable at the time

18  of the Officers' search of Jimenez's vehicle.  *See Bonivert*, 883 F.3d at 872.

19  Accordingly, the Court finds that the Officers are not entitled to qualified immunity

20  related to the search of Jimenez's vehicle.

21       Separately, Defendants argue that the Officers would be entitled to qualified

22  immunity for their use of force against Jimenez.  However, it is clearly established law

23  that officers cannot use unreasonable force when detaining or arresting an individual.

24  *See Creal v. City of Fairfield,* No. CIVS06560WBSPANJFM, 2007 WL 2019624, *3 (E.D.

25  Cal. July 10, 2007) ("The right not to be subjected to unreasonable force during an

26  arrest is clearly established. Police may use only such force as is objectively

27  reasonable under the circumstances."), citing *Graham v. Connor*, 490 U.S. 386, 397

28  (1989).  As to the first prong of the qualified immunity analysis, whether a

1  constitutional violation occurred, that question is left to the jury to decide in the first

2  instance.

3  **E.  Jimenez Has Not Demonstrated that the Sacramento Police Department**

4  **Employs an Unlawful Practice of Placing GPS Trackers in Violation of *Monell*.**

5  Jimenez alleges that the Sacramento Police Department employs an illegal and

6  systemic practice of unconstitutional searches (including the unlawful use of GPS

7  tracking).  Under *Monell*, a plaintiff must first allege in their complaint that a public

8  actor's tort is the result of: (1) an official government policy; (2) a "longstanding

9  practice or custom which constitutes the standard operating procedure of the local

10  government entity"; (3) the act of an "official whose acts fairly represent official policy

11  such that the challenged action constituted official policy"; or (4) an instance where

12  "an official with final policy-making authority delegated that authority to, or ratified the

13  decision of, a subordinate."  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (internal

14  quotations omitted); *see Monell*, 426 U.S. 658.  An individual must suffer a

15  constitutional injury for *Monell* to apply.  *City of L.A. v. Heller*, 475 U.S. 796, 799

16  (1986).  To substantiate her claim, Jimenez relies on the statements of Officer Franzen

17  that he was "trained by his supervising officers to install/plant tracking devices without

18  a warrant."  (Opp'n at 2.)

19  Here, the Court has found that the placement of the GPS tracking device in

20  Jimenez's car was valid and that no constitutional violation or tort occurred due to the

21  car's operation by Martell when the tracking device was placed.  A *Monell* claim

22  cannot be raised if no harm occurred.  Therefore, Jimenez's claim that the placing of

23  GPS tracking devices is a prohibited tort that establishes a claim under *Monell* must

24  fail.[3]

25  ////

26  ////

27

28  [3] Jimenez does not articulate that the Sacramento Police Department employs an unlawful practice of *retrieving* the GPS devices.  (*See* ECF Compl. ¶ 60; Opp'n at 12–13.)

**F. Jimenez's *Monell* Claim for Unreasonable Use of Force Cannot be Decided Until a Jury Considers the Threshold Question of Whether Unreasonable Force Was Exerted.**

Jimenez levies an additional *Monell* claim based on Officer Franzen's use of force against her and the other Officers' failure to intervene. Specifically, she asserts that the Sacramento Police Department has an unconstitutional practice of charging individuals with a violation of California Penal Code section 148 (resisting, delaying, or obstructing a peace officer) to "justify [the Officers'] use of unreasonable force." (Opp'n at 13.) As noted earlier, whether there was a constitutional violation in the first instance is a question that must be submitted to the jury. As to the existence of an official practice, Jimenez points to evidence that may substantiate an official government policy of charging individuals with Penal Code section 148 to justify the use of force. *See Price*, 513 F.3d at 966; *see also Monell*, 426 U.S. 658. In his deposition, Officer Franzen appears to admit that he has been trained to charge an individual with a section 148 violation when that individual being arrested complained of force being used against them.[4] (*See* ECF No. 20-1 at 104.) Accordingly, Defendants are not entitled to summary judgment on this *Monell* claim.

////

////

---

[4] Specifically, the Court finds that the inconclusive nature of Officer Franzen's responses in the following exchange between him and Jimenez's attorney creates a factual question as to whether there is policy or training that encourages the use of Penal Code section 148 citations for individuals who experience a use of force by officers:

Q: "Have you ever been trained – as a peace officer, have you ever been trained to charge someone with a [Penal Code section] 148 [violation] because one of the reasons is because the suspect has claimed that he or she was injured by yourself or a fellow officer, yes or no?"
A: "If they were injured because of 148, yes."
Q: "What does that mean, if they were injured because of a 148?
A: "Well, I imagine you were asking were they complaining of pain due to some use of force; correct?
Q: "Correct?"
A: "Then yes."

(ECF No. 20-1, 104:7–18.) While there is certainly ambiguity in the answer in light of the questions asked, that ambiguity must be resolved by a jury.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons discussed above, the Court GRANTS in part Defendants' Motion for Summary Judgment (ECF No. 16) as to Plaintiff's fourth cause of action (*Monell* claim for unconstitutional placement of GPS tracking devices) and DENIES Defendants' Motion as to Plaintiff's first, second, and third causes of action, and DENIES in part as to Plaintiff's fourth cause of action (*Monell* claim for unreasonable force).

IT IS SO ORDERED.

Dated:  **May 7, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC5 – Jimenez222-cv-02004.MSJ

17